IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRYANNA THOMAS,** ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 2:06cv59 |
| ) | **Electronic Filing** |
| **SECRETARY OF HEALTH & HUMAN** ) | |
| **SERVICES,** ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

March 19, 2007

**I.   INTRODUCTION**

Plaintiff, Bryanna Thomas, brings this action pursuant to 42 U.S.C. §§ 405(g) and 1395ff(b), seeking review of the final determination of the Defendant, Secretary of Health and Human Services ("Secretary"), denying her claim pursuant to the Social Security Act ("Act") for Medicare coverage for medically necessary surgery. The parties have submitted cross-motions for summary judgment and the record developed at the administrative proceedings.

After careful consideration of the decision of the Administrative Law Judge ("ALJ"), the memoranda of the parties, and the entire record, the Court finds that the decision of the Secretary is supported by substantial evidence and therefore will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment.

**II.   PROCEDURAL HISTORY**

Plaintiff is a Medicare beneficiary and a member of a Medicare Advantage HMO, known as University of Pittsburgh Medical Center (UPMC) for Life. (R. 52, 56, 161, 166.) Plaintiff has been diagnosed with gender dysphoria, also known as gender identity disorder ("GID"). (R. 63, 134, 143.) By letter dated October 1, 2004, Plaintiff's plastic surgeon, J. William Futrell, M.D., on Plaintiff's behalf, requested precertification of insurance coverage to perform male-to-female sexual reassignment surgery. (R. 134.) Plaintiff's request for coverage was denied on November 12, 2004. (R. 57-60.) Plaintiff sought reconsideration of the denial by letter dated November 29, 2004. (R. 63-77.) On March 18, 2005, the request for surgery was again denied on

reconsideration. (R. 56.) The decision advised Plaintiff that the case was being forwarded for external review and decision to the Center for Health Dispute Resolution (MAXIMUS).

On April 7, 2005, MAXIMUS issued a decision upholding UPMC for Life's decision. (R. 37-38.) After receipt of MAXIMUS's decision, on April 21, 2005, Plaintiff requested a hearing. (R. 34.) A videoconferencing hearing was held on September 26, 2005 before Jesse H. Butler, an ALJ of the Office of Hearings and Appeals of the Social Security Administration. (R. 136-77.) Plaintiff appeared at the hearing, represented by counsel. (R. 136-37.)

In his decision, dated September 30, 2005, the ALJ found that UPMC for Life was not required to cover Plaintiff's sexual reassignment surgery. (R. 15-23.) Plaintiff made a timely request for review to the Medicare Appeals Council on October 17, 2005. (R. 4-5.) On November 14, 2005, the Medicare Appeals Council denied Plaintiff's request. (R. 1-3.) The ALJ's decision therefore became the final decision of the Secretary.

Plaintiff then filed her complaint and appeal in this Court on January 12, 2006. On September 20, 2006, Plaintiff filed a motion for summary judgment. On October 20 2006, Defendant filed a motion for summary judgment.

### III.    STATEMENT OF THE CASE

Plaintiff was born on May 11, 1963 and is Caucasian. (R. 63.) According to her medical records, she has been diagnosed with GID. The records indicate that Plaintiff has identified as a pre-operative transsexual, has been presenting publicly as a female for almost four years and has been on hormone therapy treatment since 2002. She is followed medically by Dr. J. William Futrell, Dr. Stephen Perryman and Dr. Wayne Evron. She legally changed her name from Bryan F. Thomas to Bryanna Lynn Thomas. She holds a driver's license, voter's registration card and Social Security documents which identify her as a female. She has been evaluated by the Persad Center, Inc.[1] under the Standards of Care developed by the Harry Benjamin International Gender

---

[1]The Persad Center is an outpatient mental health agency for sexual minorities, gay, lesbian, bisexual and transgendered individuals and anyone who has HIV or is affected by HIV in
(continued...)

Dysphoria Association, Inc. as guidelines for determination of appropriate care for individuals suffering from GID. (R. 80-88.)

UPMC for Life denied coverage because surgical gender reassignment surgery is not a covered benefit under the UPMC for Life plan. (R. 58.) UPMC for Life's reconsideration decision was also based on the Evidence of Coverage, which stated that sexual reassignment surgery is not covered. (R. 56.) MAXIMUS's decision said Plaintiff's health plan contract stated that it was a managed Medicare contract and that the plan covered all services regular Medicare covered. MAXIMUS explained that Medicare does not pay for sexual reassignment surgery, and Plaintiff's contract likewise excluded such surgery from coverage. Accordingly, MAXIMUS concluded that the sexual reassignment surgical procedure Plaintiff sought was not a covered benefit. (R. 38.)

At the hearing, Judith DiPerna, a psychotherapist and transgender specialist employed by the Persad Center, testified on behalf of Plaintiff. (R. 140-48.) Ms. DiPerna testified that Plaintiff was a transsexual, which was someone who "up in their head" experiences themself as the opposite gender. (R. 142.) Ms. DiPerna testified further that Plaintiff's diagnosis was GID or gender dysphoria. (R. 143.) Following Ms. DiPerna's testimony, Plaintiff testified that she saw a pamphlet for the UPMC health plan at her primary physician's office. (R. 153.) She testified that she took the brochure home, called the UPMC health plan, and explained that she was seeking to have transgender surgery. Plaintiff testified that she asked the UPMC health plan representative if the surgery would be covered if it was declared medically necessary by her primary doctor, and she was told it would. (R. 153-54.) She testified that she believed that UPMC HMO should pay for her surgery because it had been paying for her hormones and other treatment and because she called and was told the surgery would be covered as long as her doctors declared it medically necessary. (R. 157.)

However, Ms. Kashuba, counsel for UPMC, asked Plaintiff to read from the section of

---

[1](...continued)
any way. (R. 141.)

the Evidence of Coverage brochure entitled "What Services Are Not Covered By UPMC for Life." (R. 161.) Plaintiff read the statement from the brochure that sex change operations were excluded from coverage. (R. 161-62.)

In addition, Ms. Kashuba asked Plaintiff to read from the Medicare National Coverage Determination for sex change operations, the language of which confirmed that Medicare does not cover transsexual surgery. (R. 163.) Connie Koch, Senior Manager for Medicare Product Development and Training at UPMC, testified that, in the twenty years she had worked in the Medicare services and benefits area, Medicare had never covered transsexual surgery. (R. 169.)

In his decision, the ALJ concluded that:

1. The appellant was an enrollee of UPMC, a Medicare Advantage plan, when she requested coverage for gender reassignment surgery on October 1, 2004.

2. More than $100 remains in controversy.

3. UPMC denied coverage of the surgery.

4. Gender reassignment surgery is covered by National Coverage Determination 140.3, and the NCD denies coverage in all cases.

5. UPMC is not required to cover the gender reassignment surgery at issue.

(R. 23.)

**IV.   STANDARDS OF REVIEW**

The Act provides that "any individual dissatisfied with any initial determination under subsection (a)(1) shall be entitled to reconsideration of the determination and ... a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and ... to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title." 42 U.S.C. § 1395ff(b)(1)(A). References to the "Commissioner of Social Security" are to be considered references to the Secretary of Health and Human Services for purposes of this kind of claim. See also 42 U.S.C. § 1395w-22(g)(5) (same procedure for appeals under Medicare Part C).

The Act limits judicial review of the Secretary's final decision on claims brought under

§ 405(g). Section 405(g) permits a district court to review transcripts and records upon which a determination of the Secretary is based. If supported by substantial evidence, the Secretary's factual findings must be accepted as conclusive. Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005). The court explained that:

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It is more than a mere scintilla but may be somewhat less than a preponderance of the evidence. In the process of reviewing the record for substantial evidence, we may not weigh the evidence or substitute our own conclusions for those of the fact-finder.

Rutherford, 399 F.3d at 552 (citations omitted).

## IV. DISCUSSION

As summarized by one court of appeals:

> The Medicare Act creates a health insurance program providing benefits to eligible elderly and disabled individuals. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh. Parts A and B provide coverage for various items and services, but exclude payment for items and services that "are not *reasonable and necessary* for the diagnosis or treatment of illness or injury...." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added).
>
> Medicare is administered nationally by the Center for Medicare and Medicaid Services ("CMS"). CMS contracts with private insurance companies, who together with local peer review organizations (collectively "contractors" or "Medicare contractors") process claims for Medicare beneficiaries. Essentially, a Medicare claim submitted for payment is approved or denied by a Medicare contractor. In making coverage decisions, Medicare contractors rely on National Coverage Determinations ("NCDs") and Local Coverage Determinations ("LCDs"). The Secretary adopts NCDs to exclude certain items and services from coverage on a national level that are not "reasonable and necessary" under the agency's interpretation of the Medicare statute. See 42 U.S.C. § 1395ff(f)(1)(B). These determinations are binding on all Medicare contractors nationwide.

Erringer v. Thompson, 371 F.3d 625, 627-28 (9th Cir. 2004) (footnote omitted).

In other words, the Secretary:

> is responsible for specifying those services that are covered under the "reasonable and necessary" standard, 42 U.S.C. § 1395ff(a); he has wide discretion in selecting the means for doing so, see Heckler v. Ringer, 466 U.S. 602, 617, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), and has traditionally acted through formal regulations and (informal) instructional manuals and letters.

Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 74 (2d Cir. 2006).

In addition to Parts A and B, Medicare contains a Part C, or the "Medicare Advantage"

5

program, codified at 42 U.S.C. §§ 1395w-21 to w-28. Medicare Part C allows CMS to contract with public and private organizations to provide coverage for all services covered by Parts A and B of Medicare. Medicare Advantage contractors must cover, at a minimum, all services covered by Medicare Parts A and B, and must comply with CMS's National Coverage Determinations ("NCDs") and the decisions of local carriers and intermediaries. 42 U.S.C. § 1395w-22(a); 42 C.F.R. §§ 422.100-101. Participation in the Medicare Advantage program by Medicare beneficiaries is entirely voluntary.

NCDs are national policy statements published by CMS to identify the circumstances under which particular services will be considered covered or not covered by Medicare. 42 C.F.R. §§ 405.732(a)(1), 405.860(a)(1). NCDs are made under the authority of section 1862(a)(1) of the Social Security Act, codified at 42 U.S.C. § 1395y, or other applicable provisions of the Act. Under CMS's regulations, NCDs are controlling authorities for Medicare contractors and Medicare Advantage organizations. 42 C.F.R. §§ 405.732(a)(4), 405.860(a)(4), 422.101(b)(1). See also Erringer, 371 F.3d at 628.

In addition, NCDs are binding authority in the Medicare appeals process including on ALJs and the Medicare Appeals Council. 42 U.S.C. § 1395ff(f); 42 C.F.R.§§ 405.732(a)(4), 405.860(a)(4). "An ALJ may not disregard, set aside, or otherwise review an NCD." 42 C.F.R. §§ 405.732(b)(1), 405.860(b)(1). "An ALJ may review the facts of a particular case to determine whether an NCD applies to a specific claim for benefits and, if so, whether the NCD has been applied correctly to the claim." 42 C.F.R. §§ 405.732(b)(2), 405.860(b)(2).

NCDs are compiled in the Medicare Coverage Issues Manual or published in the Federal Register. 42 C.F.R. § 405.860(a). These issuances are not subject to the requirements of the Administrative Procedure Act. 42 U.S.C. § 1395ff(3)(B); Friedrich v. Secretary of Health and Human Services, 894 F.2d 829, 837 (6th Cir. 1990).

NCD § 140.3 provides as follows:

**Item/Service Description**
Transsexual surgery, also known as sex reassignment surgery or intersex surgery, is the culmination of a series of procedures designed to change the anatomy of transsexuals to conform to their gender identity. Transsexuals are persons with an overwhelming desire to change anatomic sex because of their fixed conviction

> that they are members of the opposite sex. For the male-to-female, transsexual surgery entails castration, penectomy and vulva-vaginal construction. Surgery for the female-to-male transsexual consists of bilateral mammectomy, hysterectomy and salpingo-ophorectomy, which may be followed by phalloplasty and the insertion of testicular prostheses.
>
> **Indications and Limitations of Coverage**
> Transsexual surgery for sex reassignment of transsexuals is controversial. Because of the lack of well controlled, long term studies of the safety and effectiveness of the surgical procedures and attendant therapies for transsexualism, the treatment is considered experimental. Moreover, there is a high rate of serious complications for these surgical procedures. For these reasons, transsexual surgery is not covered.

(R. 44-45.) As noted by the Seventh Circuit in 1997, "Medicare does not pay for such operations, Medicare Program: National Coverage Decisions, 54 Fed. Reg. 34555, 34572 (Aug. 21, 1989); nor do standard health plans...." Maggert v. Hanks, 131 F.3d 670, 672 (7th Cir. 1997) (citation omitted).[2]

Defendant maintains that the record contains substantial evidence to support the ALJ's decision, which became the Secretary's final decision, upholding the denial of payment by the Medicare program for Plaintiff's sexual reassignment surgery. (R. 23.) The longstanding NCD applicable to this case, NCD § 140.3, unequivocally states that Medicare does not provide coverage for this surgery under any circumstances. (R. 44-45.) Thus, it contends that Plaintiff's Medicare Advantage HMO, UPMC for Life, was not required to provide coverage for the requested surgery.

Defendant notes that courts have consistently found that the Secretary's national non-coverage policies, and resulting denials of claims for procedures not yet found safe and effective by Medicare, properly fulfill the Secretary's duty to determine what services are covered under the Medicare Act. For example, in Goodman v. Sullivan, 891 F.2d 449 (2d Cir. 1989), the plaintiff's physician ordered, and the plaintiff underwent, an MRI procedure in early 1985, although MRI testing was not then a covered Medicare service, as provided in the applicable NCD. Later that same year, the Secretary extended Medicare coverage to MRIs. The plaintiff argued before the court that Congress requires Medicare to cover all medically necessary

---

[2] NCDs are available through CMS's website, http://www.cms.hhs.gov.

7

services.  The court disagreed, holding that the "prohibitory language of § 1395(a)(1)(A), which bars benefits for services 'not reasonable and necessary' for diagnosis or treatment, is not reasonably interpreted as an affirmative mandate to extend coverage to all necessary services." Id. at 450.  See also Smith v. Thompson, 210 F. Supp.2d 994 (N.D. Ill. 2002) (ALJ properly referred to NCD denying payment for cryosurgical ablation of the prostate because the procedure was experimental and investigational and plaintiff could not attack the decision with evidence that the procedure was safe, effective and necessary in his case); Bosko v. Shalala, 995 F. Supp. 580 (W.D. Pa. 1996) (ALJ properly referred to NCD denying payment for autologous bone marrow transplant to treat leukemia ).

Plaintiff argues that the "ALJ ignored the documentary evidence of medical necessity" and "disallowed relevant testimony about medical necessity."  (Docket No. 15 at 17).  However, as Defendant notes, Plaintiff misstates the applicable legal standard for assessing whether the Secretary's decision is supported by substantial evidence.  Plaintiff argues that the "ALJ erred in not giving weight to the substantial evidence of the treating physician's opinions." (Docket No. 15 at 14.)  She cites cases involving denials of Social Security disability benefits, in which courts give greater weight to the findings of a treating physician than to those of a physician who has examined the claimant only once or not at all.  Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994); Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).

However this case is not an appeal of the denial of Social Security disability benefits. Rather, it is an appeal of the denial of Medicare benefits.  There is no statutory or rule-based requirement that a treating physician's opinion of medical necessity of the procedure in question is to be given greater weight than someone else's opinion.  On the contrary, the Act specifically states that the Secretary shall determine whether or not services are "reasonable and necessary for the diagnosis or treatment of illness or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).  As the Sixth Circuit explained: "There is no legitimate claim of entitlement to a given medical procedure just because a doctor prescribes it or a patient requests it."  Friedrich, 894 F.2d at 838.

This standard applies even if the particular procedure is the best, or the only, reasonable

8

treatment for the patient. "All medically necessary procedures are not covered under the [Social Security] Act." Wood v. Thompson, 246 F.3d 1026, 1032 (7th Cir 2001). In that case, the court upheld that the Secretary's denial of coverage for dental services performed in preparation for heart valve replacement surgery because Medicare excluded coverage for dental services, even though there was no dispute that the tooth extractions were medically necessary. See also Chipman v. Shalala, 90 F.3d 421, 423 (10th Cir. 1996) (characterization of porcelain veneer crowns as medically necessary, without further authority or basis for an exception from the general dental services exclusion, did not support plaintiff's claim that payment for them should be covered by Medicare).

Accordingly, Plaintiff's arguments that the ALJ's decision denying coverage was erroneous because the ALJ did not give proper weight to evidence provided by her treating physician as to her need for the surgery is without merit. "The dispute in this case is whether the Secretary properly denied coverage for these services, despite the fact that they were medically necessary." Wood, 246 F.3d at 1035. Based on the applicable NCD, the Secretary's decision is clearly so supported.

Plaintiff also relies extensively on statutory and case law references to the Medicaid program. Plaintiff cites to the United States Supreme Court's decision in Harris v. McRae, 448 U.S. 297 (1980), which discussed Congress's 1965 passage of the Medicaid Act under Title XIX of the Social Security Act. Id. at 301. The Supreme Court explained that the Medicaid program is a cooperative endeavor in which the Federal Government provides financial assistance to participating states to aid states in furnishing health care to needy persons. Id. at 308. She cites cases observing that a state's Medicaid plan must be "reasonable" and "consistent with the objectives" of the Medicaid Act, 42 U.S.C. § 1396a(a)(17), which "has been interpreted to require that a state Medicaid plan provide treatment that is deemed 'medically necessary' in order to comport with the objectives of the Act." Weaver v. Reagan, 886 F.2d 194, 198 (8th Cir. 1989) (citations omitted). See also Hern v. Beye, 57 F.3d 906, 910 (10th Cir. 1995).

However, these decisions are not applicable to the Medicare program which is, as noted above, Title XVIII of the Act. The issue of what medical costs are or are not required to be

covered by the Medicaid program is irrelevant to the issue on appeal before this Court. All of Plaintiff's arguments about the obligations imposed on states by the Medicaid Act, in particular, the issue of medical necessity and why Plaintiff believes the Medicaid program must cover her sexual reassignment surgery, are not relevant to this appeal of the denial of Medicare coverage for the sexual reassignment surgical procedure.

Plaintiff further argues that the UPMC Medicare Advantage organization is in breach of contract and violation of Pennsylvania law by not agreeing to provide coverage for the cost of the surgery. Plaintiff states that: "A responsible insurer may not decline medically necessary services in part. In Pennsylvania, the state courts are fully competent to analyze and determine breach of contract and breach of fiduciary duties related to the claims of insured persons." (Docket No. 15 at 21) (citation omitted)).

As Defendant notes, UPMC did not breach any term of the UPMC for Life plan when it denied coverage for the surgery. The UPMC for Life Medicare Advantage Evidence of Coverage documentation in the record, which governs the scope of benefits covered by Plaintiff's Medicare HMO, specifically provides that UPMC for Life does not cover "[r]eversal of sterilization procedures, sex change operations, and non-prescription contraceptive supplies and devices." (R. 129-30 ¶ 22.) Consequently, there is no evidence of record that Plaintiff's Medicare Advantage plan breached any of the terms of coverage in this case.

In addition, it is noted that a breach of contract allegation would lie against UPMC, not the Secretary, and UPMC is not a defendant in this case. This same observation applies to the argument Plaintiff advanced at the hearing before the ALJ but has not raised herein, namely that she detrimentally relied on representations made by a UPMC health plan representative over the phone that the plan would cover the surgery if her doctors declared it medically necessary. Such detrimental reliance, assuming it stated a cause of action, would be the result of representations made by UPMC, not the Secretary.

Finally, Plaintiff argues that the "Equal Rights Amendment added to the Constitution of the Commonwealth of Pennsylvania in 1971 insures an equality of rights under our law will not allow the imposition of different burdens or benefits upon members of society based upon sex."

(Docket No. 15 at 21) (citation omitted). However, Plaintiff has not explained how the Secretary's decision denied her equal rights based on sex. The policy at issue is not a sex-based policy. The NCD applies to all Medicare beneficiaries of both sexes equally–whether coverage for male-to-female sex reassignment surgery or female-to-male sex reassignment surgery is being requested. The NCD provides that neither surgery is covered by Medicare. Accordingly, the policy does not in any way implicate Plaintiff's equal protection rights under either Federal or state law.

In summary, the ALJ's conclusion that Plaintiff's request for sexual reassignment surgery was not covered by Medicare because of NCD § 140.3 is supported by substantial evidence. The Secretary's motion for summary judgment will be granted and Plaintiff's motion will be denied.

## V.   CONCLUSION

Based on the foregoing, the motion for summary judgment filed by Defendant Secretary of Health and Human Services shall be granted. The motion for summary judgment filed by Plaintiff shall be denied. An appropriate order will follow.

s/ David Stewart Cercone  
David Stewart Cercone  
United States District Judge

cc:   John G. Burt, Esquire  
     401 Wood Street  
     Suite 810, Arrott Building  
     Pittsburgh, PA 15222

     Jessica Lieber Smolar, AUSA